UNITED STATES of America,

v.

Walter FRANZ, et al.

No. 92–70–Cr–J–20.

United States District Court,
M.D. Florida,
Jacksonville Division.

March 18, 1993.

James R. Klindt, Jacksonville, FL, for U.S.

William M. Kunstler, New York City, Thomas G. Fallis, Jacksonville, FL, for defendant.

## ORDER

SCHLESINGER, District Judge.

Before the Court is Defendant Franz' Motion to Dismiss (Doc. No. 246, filed January 19, 1993). The government filed a response in opposition on February 9, 1993 (Doc. No. 304).

The superseding indictment charges Franz with violations of 21 U.S.C. §§ 963, 846, 841(a)(1) and 18 U.S.C. § 2. The indictment also includes forfeiture claims pursuant to 21 U.S.C. § 853. Specifically, Franz and Co-Defendants are alleged to have conspired in the Middle District of Florida and elsewhere to import, manufacture and distribute a substance known as 3,4 Methylenedioxymethamphetamine ("MDMA"), and to have distributed and caused to be distributed MDMA in the Middle District of Florida. MDMA is a drug which sells on the street by the name "Ecstasy" or by its phonetic abbreviation "Ex." Some of the alleged acts occurred when MDMA was a Schedule I controlled substance analogue of Methylenedioxyamphetamine ("MDA"), and others while MDMA itself was a Schedule I controlled substance.

Franz essentially makes five arguments in support of his Motion to Dismiss: (1) that the statute criminalizing the manufacture and distribution of controlled substance analogues, 21 U.S.C. § 813, is unconstitutionally vague; (2) that MDMA is not an "analogue" within the meaning of the statute; (3) that MDMA cannot be both an analogue and a Schedule I controlled substance; (4) that the Drug Enforcement Administration's (DEA) 1988 placement of MDMA into Schedule I violated a remand order of the First Circuit the previous year; and (5) that the DEA's findings were not based on substantial evi-

dence, therefore making the scheduling unlawful. Franz also requests an evidentiary hearing to present additional evidence to support these arguments.

**(1)** *Is 21 U.S.C. § 813 unconstitutionally vague?*

█ A penal statute must define the criminal offense with sufficient definiteness so that people of ordinary intelligence can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). The void-for-vagueness doctrine focuses not only on actual notice to citizens and arbitrary enforcement, but more importantly on the "requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). Where such minimal guidelines are not provided, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 575, 94 S.Ct. at 1248 (*cited in Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858).

█ Whether the Analogue Act, 21 U.S.C. § 813, is unconstitutionally vague was an issue directly put before the Fifth Circuit in *United States v. Granberry,* 916 F.2d 1008 (5th Cir.1990). The court of appeals there found that the term "controlled substance analogue" in section 813 is "clearly and specifically defined, in terms readily comprehensible to the ordinary reader," and that the statute provides adequate notice of what conduct is prohibited. *Id.* at 1010. The statute "makes plain," the court stated, that while not listed themselves as Schedule I or II controlled substances, drugs that are chemically designed to be similar to Schedule I or II controlled substances will nonetheless be considered as such if (1) they are substantially similar chemically to drugs that are on those schedules; (2) they produce effects on the central nervous system similar to those produced by drugs on those schedules; or (3) they are represented or intended to produce effects similar to those produced by drugs on those schedules. *Id.* (citing 21 U.S.C. § 802(32)(A) (defining the term "controlled substance analogue")).

Notwithstanding Franz' contention that the "conclusionary and self-serving statements and opinions in *Granberry* cannot be seriously considered," the Court concurs with the finding of the Fifth Circuit that "[t]here is nothing vague about the statute." *Id. See also United States v. Desurra,* 865 F.2d 651, 653 (5th Cir.1989) (finding no vagueness in Analogue Act itself, and noting also that the legislative history of the Act makes clear to defendants the crimes which the Act proscribes).

The Court notes that one District Court, in dismissing a prosecution for distribution of the drug alphaethyltryptamine (AET), recently held that the Analogue Act is unconstitutionally vague as applied to that drug. *See United States v. Forbes,* 806 F.Supp. 232, 239 (D.Colo.1992). The indictment there alleged that AET was a "controlled substance analogue" having a substantially similar chemical structure to dimethyltryptamine (DMT) and diethyltryptamine (DET), both Schedule I controlled substances. However, the court there distinguished both *Granberry* and *Desurra* because "neither decision addressed the precise question presented" in *Forbes,* which was "whether [the Analogue Act] is unconstitutionally vague *as applied to* AET." *Id.* at 238 (emphasis supplied).

The court found that AET, which was developed in 1960 as a prescription anti-depressant, was not "chemically designed to be similar to controlled substances." *Id.* While Congress declared that the purpose of the Analogue Act was to "attack underground chemists who tinker with the molecules of controlled substances to create new drugs that are not yet illegal," none of the *Forbes* defendants had engaged in such conduct, because the substance (AET) they were alleged to have purchased and distributed pre-existed the drugs to which AET is a purported analogue. *Id.*

**(2)** *Is MDMA an "analogue" within the meaning of the statute?*

█ Prior to the DEA's finding of February 22, 1988 that MDMA should be placed into Schedule I (the actual scheduling becom-

ing effective one month later), MDMA had been a controlled substance analogue since October 27, 1986, the date the provisions of the Controlled Substance Analogue Enforcement Act (codified at 21 U.S.C. § 813) became effective. Some of the acts imputed to Franz in the indictment are alleged to have occurred while MDMA was a controlled substance analogue. Franz contends that MDMA is not an "analogue" because its chemical composition and effects on the central nervous system are not "substantially similar," 21 U.S.C. 802(32)(A), to that of MDA. Several courts have found that MDMA qualified as a controlled substance analogue, *e.g. United States v. Raymer*, 941 F.2d 1031, 1045–46 (10th Cir.1991); *Desurra*, 865 F.2d at 653, and the Court rejects Franz' argument that MDMA cannot be considered as such. If the government, as it contends, will present testimony at trial as to the similarity between MDMA and MDA, then Franz will, of course, have a full opportunity for cross-examination on this issue.

**(3) *Can MDMA now be punished as an "analogue"?***

It is certainly true that, as noted by the *Raymer* court, the scheduling of MDMA has had a "checkered history." 941 F.2d at 1045. The DEA's first attempt to temporarily schedule MDMA as a Schedule I controlled substance was invalidated on procedural grounds. *See United States v. Caudle*, 828 F.2d 1111, 1113 (5th Cir.1987); *United States v. Spain*, 825 F.2d 1426, 1429 (10th Cir.1987). The final rule placing MDMA in Schedule I was vacated for further agency consideration. *See Grinspoon v. Drug Enforcement Admin.*, 828 F.2d 881, 898 (1st Cir.1987), discussed *infra*.

The above cases addressed the DEA's attempts to label MDMA as a *Schedule I controlled substance*. As of October 27, 1986, however, MDMA was a controlled substance *analogue*. While the Analogue Act provides that an analogue shall be "treated" as a controlled substance in Schedule I, the Act makes clear that a controlled substance analogue "does not include ... a controlled substance." 21 U.S.C. § 802(32)(B)(i). Accordingly, the invalidation of the DEA's initial attempts to place MDMA on Schedule I does not similarly render as invalid a prosecution—now or then—under the Analogue Act for alleged acts involving MDMA *during the period when MDMA was properly classified as an analogue*. *Raymer* thus correctly rejected the proposition, akin to that asserted by Franz, that MDMA could not be a controlled substance analogue during the time when the government failed to classify MDMA as a Schedule I controlled substance.

Although Franz implores the Court to reject the analysis in *Raymer*, the Court instead would reiterate the conclusion reached therein, that once the Schedule I scheduling was held invalid, "MDMA was not a controlled substance and quite correctly could be considered an analogue within the definition contained in [the Analogue Act]." *Raymer*, 941 F.2d at 1046 (citing *Desurra*, 865 F.2d at 653). Therefore, the portion of the instant indictment (parts of Counts I and II) charging Franz with having violated the Analogue Act, is not infirm.

**(4) *Did the DEA's placement of MDMA onto Schedule I in 1988 violate the First Circuit's remand order in* Grinspoon?**

■ No drug or other substance may be placed into Schedule I unless each of the following findings are made by the Attorney General/DEA:

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b)(1). Finding that MDMA met all three of these statutory requirements, the DEA on November 13, 1986 issued a final rule placing MDMA into Schedule I. 51 Fed.Reg. 36,552 (Oct. 14, 1986). The following year, in *Grinspoon v. Drug Enforcement Admin.*, 828 F.2d 881 (1st Cir. 1987), the First Circuit held that the DEA improperly relied on the absence of FDA interstate marketing approval as conclusive evidence that MDMA has no currently accepted medical use and lacks accepted safety for use under medical supervision.

"We find no necessary linkage," the court stated, "between failure to obtain FDA interstate marketing approval and a determination that the substance in question is unsafe *and* has no medical use.... [I]t is plainly possible that a substance may fail to obtain interstate marketing approval even if it has an accepted medical use." *Id.* at 887. The court found it "unlikely" that substituting this lack of FDA approval for the statutory requirements was consistent with Congress' intent in enacting the Controlled Substances Act ("CSA"). *Id.* at 888.

On remand, the DEA replaced MDMA on Schedule I without any further hearings. Defendant unequivocally asserts that this action was in derogation of the First Circuit's remand order, and therefore that MDMA is currently improperly classified as a Schedule I controlled substance. What exactly, then, did *Grinspoon* require the DEA to do on remand?

The precise holding of the court in this regard is as follows:

> We therefore vacate the Administrator's determination that MDMA should be placed in Schedule I of the CSA and remand the rule for further *consideration* by the DEA.

> . . . . .

> [T]his aspect of the case must be remanded and *reconsidered....*

> . . . . .

> For the foregoing reasons, the rule is vacated and remanded to the Administrator for *further proceedings* consistent with this opinion.

*Id.* at 891, 897, 898 (emphasis supplied). It is Defendant's contention that *Grinspoon* mandated that a new "hearing" take place, at which new evidence was to be presented concerning MDMA's accepted medical use in treatment and accepted safety for use under medical supervision. A review of the administrative record makes clear that no such hearing ever occurred subsequently. Does this necessarily mean that the mandate of *Grinspoon* was violated? For the reasons discussed below, the Court finds it does not.

In a section of the opinion entitled "Need For A Meaningful Hearing," to which Franz alludes, the First Circuit stated that Congress made clear that certain emergency scheduling and scheduling of analogues could justifiably occur "without first requiring a hearing so long as FDA approval is lacking." *Id.* at 891. This is not the case, however, in "general administrative scheduling procedures," the court stated, "and the hearing requirement should be given full effect rather than being shortcircuited by blind reliance on the absence of FDA approval." *Id.*

The term "hearing," however, "undoubtedly has a host of meanings." *United States v. Florida East Coast Railway Company,* 410 U.S. 224, 239, 93 S.Ct. 810, 818, 35 L.Ed.2d 223 (1973) (citing 1 K. Davis, Administrative Law Treatise § 6.05 (1st ed. 1958). While notice and an opportunity to be heard may be "fundamental to due process of law," *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 178, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (Douglas, J., concurring), an opportunity to be heard "must be tailored to the capacities and circumstances of those who are to be heard," *Goldberg v. Kelly,* 397 U.S. 254, 269–70, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970), and the nature of a hearing depends on an "appropriate accommodation of the competing interests involved," *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975).

As used in the Administrative Procedure Act, the statute governing practice and proceedings before federal administrative agencies, the term hearing "does not necessarily embrace either the right to present evidence orally and to cross-examine opposing witnesses, or the right to present oral argument to the agency's decisionmaker." *Florida East Coast,* 410 U.S. at 240, 93 S.Ct. at 818. The Court, therefore, disagrees with Franz' contention that *Grinspoon's* remand for "further proceedings" required a "live" hearing at which witnesses could be called and oral argument presented.

It is clear that the First Circuit was concerned primarily with the DEA's fundamental reliance on the lack of FDA approval. A hearing on this issue could not be "meaningful" and would be "reduced to an empty formality" if the DEA's application of section 812(b)(1), which lists the three factors for Schedule I, turned "solely" on the existence of FDA approval. *Grinspoon,* 828 F.2d at 890.

But what if the DEA were to not rely conclusively on the absence of FDA approval? For example, assume that after the instant hearing took place,[1] the DEA made the same finding—that all the criteria were met for placing MDMA on Schedule I—without stating that lack of FDA approval was "conclusive evidence," *id.* at 891, that such a finding was warranted.

This is precisely what occurred after the remand order was issued. In its Final Rule of February 22, 1988, the DEA found that "MDMA has no accepted medical use in treatment in the United States and lacks accepted safety for use under medical supervision." 53 Fed.Reg. 5156, 5158 (Feb. 22, 1988). Based on the ALJ proceeding already held, the DEA reconsidered the evidence in the record, adopted its previous findings, and then made new findings. Although the DEA's discussion of its findings did contain *reference* to lack of FDA approval, the DEA made it clear that this was not a "conclusive" factor. *Id.* at 5158. In fact, none of the new findings themselves discuss FDA marketing approval at all.

Nowhere in its opinion does the *Grinspoon* court state that the administrative hearing already held was deficient or incomplete. Rather, the Court's concern was that the DEA, irrespective of its actual finding, not rely "solely," "necessarily" or "blindly" on the lack of FDA approval.[2] Although it obviously took place *before* the remand order, the proceeding before the ALJ in this matter was indeed that type of "meaningful hearing" which *Grinspoon* suggested was necessary. That the DEA did not wish to duplicate an already extensive record it found "extraordinarily complete" is not incompatible with the *Grinspoon* mandate.

In *United States v. Piaget,* 915 F.2d 138 (5th Cir.1990), the defendant raised an identical argument: that the DEA had to conduct further "hearings" to comply with *Grinspoon*'s remand for "further proceedings." The Court rejected that contention, holding that "[d]ue to the completeness of the record below, the Administrator could properly place MDMA on schedule I *by relying on the prior hearing before the ALJ.*" 915 F.2d at 141 (emphasis supplied). While Franz decries the lack of lengthy analysis by the *Piaget* court, its reasoning, while brief, is nonetheless sound, and directly on point with the instant dispute. What can be stated in many paragraphs can also be stated in one.[3]

---

1. The original hearing in this matter took place before an Administrative Law Judge ("ALJ"). Thirty-three witnesses testified and ninety-five exhibits were received into evidence. 51 Fed.Reg. 36,552–53 (Oct. 14, 1986). The ALJ's recommendation that MDMA be placed into Schedule III was ultimately rejected by the DEA, which decided that substantial evidence existed to support a placement into Schedule I. *Id.* at 36,552.

2. Franz' argument is that "nowhere" in the opinion "did the First Circuit indicate—explicitly or implicitly in any other way—that it was appropriate to rely on lack of FDA approval—even as one of several or other factors." Motion at 34. It was not the First Circuit's intention, however, to tell the DEA what factors were "appropriate" for consideration. Mindful of not "unduly infringing upon the Administrator's legitimate discretion to develop a legally acceptable standard," *Grinspoon,* 828 F.2d at 892, the court's directive was rather that the DEA not *conclusively* rely on lack of FDA approval.

3. As to the relevance of *Piaget,* the Court notes that four pages in Franz' seventy-nine page Motion to Dismiss are devoted to his argument that "[t]he Fifth Circuit's Paiget [sic] Decision has no Precedential Value in the case at bar—Paiget [sic] Involved a Different Issue: it is Full of Errors and Was Incorrectly Reasoned." Motion at 29.

Franz felt it necessary to summarize various "technical errors" in that opinion, while his own Motion misspells that case's name at least twenty-six times. The Court also appreciates Franz' attempt to enlighten the Court as to the weight an Eleventh Circuit District Court should afford a Fifth Circuit opinion. To the extent that Franz asserts that *Piaget* has no precedential value in this Court, he is correct. For that matter, neither does *Granberry, Desurra, Raymer* or the vast majority of other-Circuit cases cited by the government and Franz. Then again, *Grinspoon* is not binding on this Court, either.

Nevertheless, as Franz and counsel for both sides are well aware, these cases are highly instructive. They not only involve the very same drug, MDMA, under which Franz is prosecuted, but address some of the identical issues Franz has raised. This Court is highly competent to reexamine on its own the entire administrative record in this matter, and, in fact, has done so. That there is a lack of Eleventh Circuit jurisprudence as to the issues at bar, however, will not prevent this Court from utilizing informative guidance from brethren courts. Effective advocacy entitles, and may even require, counsel for Franz and the government to "pick and choose" from among those other-Circuit opinions which are helpful to their cause. A party before one

(5) *Was the DEA's 1988 scheduling of MDMA supported by "substantial evidence"?*

■ In reviewing the DEA's placement of MDMA into Schedule I in 1988, the threshold inquiry is whether each of the three statutorily required findings is based on "substantial evidence." *Grinspoon,* 828 F.2d at 894. This term means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490, 522–23, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Substantial evidence is "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). Of particular importance to the instant case, however, is the Supreme Court's further explanation of this term:

> [T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.

*Donovan,* 452 U.S. at 523, 101 S.Ct. at 2497 (quoting *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)).

■ In its 1988 placement of MDMA into Schedule I, the DEA relied on eighteen findings it had previously made in its 1986 scheduling, and made thirteen additional findings. 53 Fed.Reg. 5156 (Feb. 22, 1988). As to the first statutory factor, whether MDMA has a high potential for abuse, *Grinspoon* itself held that the DEA's positive finding on this issue in 1986 "is amply supported by a substantial amount of independent evidence." 828 F.2d at 898. *Grinspoon* noted that the CSA itself provides no definition of the phrase "high potential for abuse." *See id.* at 893. Instead, the court was enlightened by the House Committee Report to the CSA, which provided that the DEA may permissibly reach a conclusion regarding a sub-

stance's potential for abuse by comparing the substance to drugs already scheduled in the CSA. *See* H.R.Rep. No. 1444, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4601. The DEA's finding that MDMA had a "high potential for abuse" did, in fact, entail analyses of MDMA relative to MDA, already a Schedule I substance. This included evidence that: (1) MDMA possesses the psychomimetic properties of MDA; (2) test rats trained to recognize MDA also recognized MDMA during drug discrimination; (3) MDMA and MDA produce the same spectrum of pharmacological effects in mice, dogs and monkeys when observed during toxicity studies; (4) like MDA, MDMA produces neurotoxic effects when administered to animals; and (5) MDMA and MDA both produce long term reduction in serotonin levels and serotonin uptake sites in the rat brain. 53 Fed. Reg. 5156 (Feb. 22, 1988); 51 Fed.Reg. 36,-552 (Oct. 14, 1986).

The DEA's identical finding *after* the remand that MDMA has a high potential for abuse is, thus, consistent with the First Circuit's mandate, which remanded only for re-evaluation of the *other* two factors, accepted medical use in treatment and accepted safety for use under medical supervision. The Court concurs with the finding in *Grinspoon* that the DEA's finding as to MDMA's high potential for abuse is based on substantial evidence.

As to the second statutory requirement, that MDMA be found to lack "currently accepted medical use in treatment in the United States," the evidence relied on by the DEA included evidence that: (1) the chemistry, toxicology and pharmacology of MDMA have not been sufficiently studied in animals to provide a scientific basis for experimentation or clinical use in humans; (2) the published literature contains no references to the clinical use of MDMA; (3) recognized texts, reference books and pharmacopeia contain no references to the therapeutic use of MDMA; and (4) a World Health Organization committee reviewing MDMA for possible scheduling under the 1971 Convention on Psychotropic

court, however, need not gratuitously disparage another court merely because its holding is detri-

mental to his argument.

Substances, to which the United States is a party, found, inter alia, that MDMA had no defined therapeutic use and that the anecdotal data regarding MDMA's clinical utility lacked sufficient indicia of reliability. 53 Fed.Reg. 5156 (Feb. 22, 1988). The Court finds that there is substantial evidence in the Administrator's record to conclude that MDMA had no currently accepted medical use.

The *Piaget* court similarly found that MDMA had no currently accepted medical use, but the Fifth Circuit did not explicitly state therein whether there was substantial evidence in the record as to the third element, lack of accepted safety for use under medical supervision. In any event, the Administrator relied in part on the following evidence in finding that there is a lack of accepted safety for use of MDMA under medical supervision: (1) a scarcity of animal toxicity studies showing that MDMA will not produce irreversible harm to organs at proposed human doses; (2) a lack of reproductive or carcinogenic studies which might demonstrate the degree of the drug's long term's safety; (3) studies showing that MDMA produces neurotoxic effects in animals; and (4) scientific and medical opinions that further testing is necessary prior to human use. 53 Fed.Reg. 5156 (Feb. 22, 1988). The Court finds that the DEA's conclusion that MDMA lacks accepted safety for use under medical supervision is supported by substantial evidence.

The "record as a whole," which must be examined to conduct the instant judicial review, might lead Franz, certain members of the medical/pharmacological community, and even the ALJ who conducted the hearing, to reach different conclusions than those made by the DEA. The law is clear, however, that notwithstanding one set of views on a matter, an administrative agency's contrary finding can still be supported by substantial evidence. *See Donovan,* 452 U.S. at 523, 101 S.Ct. at 2497; *Arkansas v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (reviewing court should accept agency's findings if they are supported by substantial evidence on the record as a whole); *Home Health Services of the U.S. v. Schweiker,* 683 F.2d 353, 356–57 (11th Cir.1982) (if agency's findings are supported

by substantial evidence and "are not arbitrary or capricious, the reviewing court cannot reverse the findings of the agency on the basis that it would have decided the case differently"); *Grinspoon,* 828 F.2d at 895 (citation omitted) ("[e]ven if reasonable minds could also go the other way, we must uphold the [agency] if its ultimate finding is supported by substantial evidence in the record as a whole"). While Franz is more than entitled to his (opposite) perspective on this matter, the DEA's placing of MDMA into Schedule I in 1988 is supported by substantial evidence.

The Court finds that the record as to the above issues is quite complete, and that there is no need for an evidentiary hearing on this matter.

Accordingly, the Motion to Dismiss (Doc. No. 246) is DENIED.

DONE AND ORDERED.